**Ronald F. JACKSON, Petitioner,**

v.

**Sam P. GARRISON, Warden, Central Prison, North Carolina Department of Correction, Raleigh, North Carolina, Respondents.**

No. C–C–78–036.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Sept. 4, 1979.

Milton M. Moore, Jr., Savannah, Ga., for petitioner.

Joan Byers, North Carolina Dept. of Justice, Raleigh, N. C., for respondents.

## ORDER ALLOWING HABEAS CORPUS

McMILLAN, District Judge.

An evidentiary hearing was conducted on April 16, 1979, upon the claims for relief remaining after this court's order of October 12, 1978. Those remaining claims (retaining their original numbers) are as follows:

1. *Suggestive pretrial identification procedures.*–The pretrial identification procedures are highly suspect, and the evidence at the hearing did little to relieve those

---

suspicions. However, the record can be read to support the results reached by the state court denying relief on that basis, and this contention alone would not justify habeas corpus relief.

7. *Prejudice through pretrial publicity.*–The claim of prejudice through pretrial publicity was not supported in any substantial way by the evidence at the hearing, and this claim will be dismissed without further discussion.

5. *Exclusion of evidence of successful polygraphic examinations.*–Petitioner's claim for relief based upon exclusion of his evidence that he repeatedly and successfully passed polygraphic examinations is made of sterner stuff.

Two experts in the administration and interpretation of polygraph tests gave evidence. Claude Gilliken was former agent for the North Carolina State Bureau of Investigation, and its chief polygraph examiner until he left the agency in June of 1977. He testified that his experience with the polygraph extended over a period from 1963 to 1975. He described the polygraph examination as a recording and interpretation of four biological and metabolic phenomena: (1) respiration; (2) heart function; (3) blood pressure; and (4) galvanic skin response. Questions or suggestions about sensitive subjects produce changes in the otherwise normal mechanical or electronic readings of those functions. Breathing may accelerate, slow down or stop; heartbeat may speed up or become irregular; blood pressure may increase; the skin may sweat or change texture or tension. Experienced operators attempt to put the subject at ease, to run a number of test questions and to operate polygraph examinations in an objective manner which tends to eliminate the likelihood of accident or mistake or intentional manipulation by the subject.

Mr. Gilliken testified that he administered three separate tests to the petitioner upon the request of J. Mac Boxley, of the North Carolina Board of Paroles, who had been asked by the Governor's office to look into the question. Every one of these three tests was negative; that is, it indicated that there was no deception in the petitioner's answers to questions involving his possible participation in the robbery for which petitioner was convicted.

Frank Faulk is a retired chief polygraph examiner for the South Carolina Law Enforcement Division (1949–1976) and former president of the American Polygraph Association. He testified that he examined petitioner in October 1976 at the request of the Attorney General of South Carolina in connection with a request for extradition. He said that after proper preparation, he put to Mr. Jackson questions involving facts objectively known to be true, and questions involving petitioner's presence in North Carolina at the time of the robbery and his participation in that robbery. His conclusion was: "No deception indicated" by any of the petitioner's responses.

Both Faulk and Gilliken indicated that for persons of normal intelligence, the responses to such polygraph examinations are 95% or 96% accurate. Gilliken indicated that 3% of such tests are inconclusive and 1% or so are erroneous. *See United States v. Wilson*, 361 F.Supp. 510, 512 (1973).

The status of polygraph evidence in criminal cases is unclear in the Fourth Circuit and, arguably, in North Carolina law. The old standby test for the admissibility of "scientific" evidence, laid down in *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923), is out of date and has met increasing rejection among the courts. The *Frye* "general acceptance in the particular field in which it belongs" standard becomes itself a battle of experts on expertise, and, as the Second Circuit noted in *United States v. Williams*, 583 F.2d 1194 (2nd Cir. 1978), has been implicitly modified in the Fourth Circuit in *United States v. Baller*, 519 F.2d 463 (1977). The *Baller* court (519 F.2d at 466) in considering the reliability of voice spectography concluded that unless an exaggerated popular opinion of the accuracy of a

particular technique makes its use prejudicial, "it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross–examination and refutation."

The two grounds of rejection in the most recent North Carolina case on polygraph evidence, *State v. Steele*, 27 N.C.App. 496, 219 S.E.2d 540 (1975) (insufficient scientific reliability and protection of the accused) would not suffice at this time to exclude the evidence on which petitioner Jackson bases his plea. First, the reliability of polygraph testing has improved steadily while our understanding of the fallibility of expert and scientific evidence has sharpened, and, second, in this case it is the accused, not the prosecutor, who seeks to introduce the polygraph evidence.

A polygraph (like the speedometer, the thermometer, the sphygmomanometer [device that measures blood pressure], the stethescope, the radar speed detector, the light meter, the range finder, the scales with which we check on excess calories, and the eyeball, by which we judge color, shape, size, distance and motion) is a mechanical or mechanical–hydraulic–electronic device which reads or observes and reports phenomena and enables the operator to give a simple answer to a complicated question. Every person relies upon such instruments and others of greater or lesser complexity in making everyday decisions involving speed, distance, size, weight, comfort, life and death. None of those devices, especially the human eye, is completely reliable. The human reading of what the eye sees is far less than 95% accurate. Automobile speeds and motions are variable. Mistakes in reading medical dials and instruments are notorious. Failures of engineering and mechanical "failsafes" and wonders such as altimeters, pressure gauges and warning lights are daily in the headlines.

Those failures and shortcomings affect the *weight* we give to the enlightenment we receive from machines, but they do not move us to *reject* such mechanical aids out of hand. Whether to find a fact or to take an action based upon the reading of a police radar device or the surgeon's stethescope involves, first, a preliminary judgment that this instrument or phenomenon is sufficiently reliable to be given *some* evidentiary value; and, second, the judgment as to *how much* weight such technical devices should be accorded.

■ The evidence shows that the polygraph reading is at least as scientifically reliable as many scientific and expert methods for determining competence or honesty (psychiatric or social scientific evidence), and that it is more generally reliable than many of the accepted ways of trying to prove whether somebody is lying or not. If witnesses are allowed to testify as to reputation, shiftiness of eyes or clarity of gaze, it is unfair to prohibit the introduction of the more reliable method of measuring external responses which the polygraph examination represents. There is no reason why, subject to proper instructions, the jury should not be allowed to consider such evidence.

■ 8. *Prejudice resulting from the limitation of the number of witnesses petitioner could subpoena.* The trial judge in petitioner's third trial arbitrarily limited the number of witnesses petitioner, an indigent, could call at state expense by restricting them to those persons then within a certain geographical area in South Carolina, the area of Bennettsville. This restriction was unreasonable, as the location of witnesses at the time of trial bore no rational relation to the strength or relevance of the testimony which they might have had to offer. Witnesses from Arizona, Virginia and Maryland were not available to petitioner simply because they had moved from Bennettsville in the time between the date of the crime and the third trial.

■ The question remains whether petitioner was prejudiced by the lack of those

unreachable witnesses. The appeal record and the hearing transcript for this proceeding show that at the very least two, and at the most four, of the uncalled witnesses would have contributed substantially to petitioner's case. Both Mrs. Brennan, who lived in Virginia at the time of the trial, and Mrs. Carpenter, who lived in Maryland, were among "the best quality witnesses that we had" according to petitioner's trial counsel. Record on Appeal (third trial) pp. 26–27. Mr. Carpenter, who was Jackson's employer at the time of the robbery, would have been a very credible witness. Hearing transcript, April 19, 1979, p. 63. In addition to credibility, the missing witnesses would have added materiality to petitioner's case, as Mrs. Brennan was one of the two besides Jackson's brother who could pinpoint Jackson at the exact moment of the robbery. Hearing transcript, p. 30.

Petitioner's alibi was his whole defense. In that context, denying him opportunity to present this evidence, combined with the exclusion of the polygraph evidence, deprived him of the constitutional right to a fair trial. *Chance v. Garrison*, 537 F.2d 1212 (4th Cir. 1976).

The writ of habeas corpus is allowed. Petitioner shall be released without any bond being required for his further appearance. This writ will become final unless he is retried within a reasonable time.