[No. F014257. Fifth Dist. Oct. 13, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL A. PIZARRO, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

## COUNSEL

Fern M. Laethem, State Public Defender, under appointment by the Court of Appeal, and Valerie Hriciga, Deputy State Public Defender, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Acting Assistant Attorney General, Edmund D. McMurray, Frederick R. Millar, Jr., and Jo Graves, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARDAIZ, J.**—On August 11, 1989, an information was filed alleging appellant Michael A. Pizarro had committed the following crimes: count I,

murder of Amber B. (Pen. Code, § 187) with the special circumstances that the murder was committed while appellant was engaged in the crime of rape (Pen. Code, § 190.2, subd. (a)(17)), and that the murder was committed while appellant was engaged in the crime of a lewd or lascivious act upon a child under age 14 (Pen. Code, § 190.2, subd. (a)(17)); count II, forcible lewd or lascivious act on a child under age 14 (Pen. Code, § 288, subd. (b)); and count III, forcible rape (Pen. Code, § 261, subd. (a)(2)).

On August 17, 1989, appellant was arraigned and pleaded not guilty.

On May 22, 1990, jury selection commenced. On May 31, 1990, during trial, a *Kelly/Frye*[1] hearing was held to determine the admissibility of the results of DNA identification evidence and the trial court ruled the results were admissible.

On June 6, 1990, the jury returned verdicts finding appellant guilty of all counts and also finding the charged special circumstances to be true.

On July 3, 1990, appellant was sentenced to life in prison without the possibility of parole on count I, to be served consecutively to the upper term of eight years on count II. The sentence on the rape count was stayed pursuant to Penal Code section 654.

On July 6, 1990, appellant filed his notice of appeal.

He contends that the admission of the results of DNA testing as well as the use of a genetic statistical data base was error under *Kelly/Frye*. He further contends that instructional error was committed regarding voluntary intoxication.[2]

## FACTS

On June 10, 1989, appellant, along with his wife, Sandy, and his five-month-old son, drove from Clovis to North Fork, California, to visit his family. They arrived around noon and, soon thereafter, appellant went to a schoolyard to play basketball with a friend. Following the basketball game, appellant visited the home of his friend and also spent time at Manzanita Lake. Appellant then returned to his mother's house and, later that evening (about 8 p.m.), he and his wife went to a party at a mobilehome park in town. Appellant's 13-year-old half sister, Amber, was also at the party.

---

[1] *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] and *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013 [54 App.D.C. 46, 34 A.L.R. 145] (hereinafter *Kelly/Frye*).

[2] In the unpublished portion of this opinion we conclude there was no instructional error.

Appellant had consumed beer throughout the afternoon and he continued to drink at the party. Because Sandy wanted to leave before appellant was ready to go, she and appellant argued and Sandy left without him—then returned to try to persuade appellant to join her. Eventually, appellant began walking toward his mother's house. Sandy followed in their truck and repeatedly asked appellant to get inside with her. Appellant ignored the requests and behaved erratically, crisscrossing the road, lying in front of the truck and, occasionally, hiding from Sandy. After approximately a half hour, Sandy left appellant in the road and drove to the home of her mother-in-law, Chris Conston.

Sandy arrived at the Conston house about 1 a.m. Amber, who had returned from the party earlier, agreed to accompany Sandy back to the area where she had left appellant. Amber's mother gave her a flashlight before she left with Sandy and the Pizarros' baby in their truck.

Thereafter, Sandy and Amber saw appellant walking towards town but when they approached him, appellant ran. When Sandy turned around to follow, appellant ran up an embankment and Sandy shined the flashlight on him. Appellant then came down from the embankment and, again, began running for town. Sandy stopped the truck and Amber, who had been holding the baby, put the child down on the seat and got out, taking the flashlight with her. Sandy watched Amber cross the street towards the area where appellant had gone. Sandy picked up her baby and closed the passenger door. When she looked up, Amber was gone.

Sandy called out for appellant and Amber but there was no response. She circled her truck around and yelled for them to turn on the flashlight or say something to let her know they were all right. She then saw a flash of light coming from the area where she had last seen Amber. She then heard a scream and, immediately following the scream, a slight muffled sound. Frightened, she returned to the Conston house and told her mother-in-law what had happened. It was then almost 2:30 a.m.

Chris Conston called 911 and Sandy arranged to meet sheriff's deputies at Sierra Automotive which she believed was near the area where appellant and Amber had last been seen. At 2:51 a.m., within 20 minutes after the 911 call, Madera County Sheriff's Deputy Weisert met Sandy and was directed to the place where Sandy thought appellant and Amber had gone.[3] Another deputy and Chris Conston also went to the area and they drove up and down the

---

[3]The following day Sandy realized she had made an error and had actually last seen Amber and appellant a short distance up the road (under one-tenth of a mile away). It was in that area that Amber's body was found.

road calling for Amber over a public address system. There was no response and, soon after 4 a.m., the officers left the area. After waiting for Sandy's parents to come for Sandy, Chris Conston also went home.

About 5:50 a.m., appellant showed up alone at his mother's house. He was dirty, sleepy and appeared to his mother to be drunk. Appellant told his mother that, on his way home, a man had confronted him and accused him of kidnapping his sister.[4] Mrs. Conston then left to search for Amber at a friend's house and appellant went to sleep.

Shortly after 7 a.m., officers again began searching the area which Sandy Pizarro had pointed out. When they were unable to find Amber, Deputy Lidfors went to the Conston home at about 8 a.m. to talk to appellant. Appellant was awakened and he told the officer to look at another location approximately one-tenth of a mile farther west from the area where they had been searching. During this conversation, appellant did not appear intoxicated or "hung over" to the officer.

Deputy Lidfors, along with Deputy Nelson, went to the area described by appellant and there they found Amber's body. Amber's pants had been removed and her underpants were down around her right foot; her T-shirt and bra were pushed up above her breasts. Deputy Lidfors noticed bruises on Amber's face and blood smears on her stomach and leg. Her flashlight was lying by her feet.

An autopsy was performed and the pathologist, Dr. Gerald Dalgleish, determined that suffocation was the cause of death. He also noted the presence of bruises on the right side of the victim's face as well as swelling and discoloration around her lips and a mark on her nose. Amber had been alive when the injuries to her face were inflicted and the pathologist believed that the flashlight could have been the instrument which caused some of the injuries. Semen was present in Amber's vagina.

On the morning Amber's body was found, appellant was taken to the sheriff's substation and interviewed by Sergeant Gauthier. Appellant told Gauthier that, after Amber had followed him into the brush, he told her he was mad at his wife and did not want to return to the truck. He said he then started to walk up the hill but Amber was mad because he had taken her flashlight. He said he was several paces away from her so he turned to toss the flashlight back to her and then left. According to appellant, that was the

---

[4]Appellant later told Madera County Sheriff's Detective Kern that the sheriff had stopped him and made the accusation. He told Deputy Weisert that "some cops" had met him and accused him of kidnapping.

last time he had seen Amber. At the time of the interview, Sergeant Gauthier examined appellant's hands and found that the knuckles on one of appellant's hands were red and swollen. Gauthier collected the clothes appellant was wearing and arranged to have samples of appellant's blood drawn.

Appellant was also interviewed 10 days later by Madera County District Attorney investigator Fred Flores. Appellant told Flores that, after he had thrown the flashlight back to Amber, he continued running up the hill and passed out about 100 yards later. Appellant claimed he did not know what occurred from that point until the time he awoke and walked to his mother's house. When Flores asked appellant how he would feel about being arrested, appellant told Flores, "it would be a big mistake because [Flores] did not have enough proof." Appellant did not specifically deny having killed his sister in that conversation. He did deny that he had undressed.[5]

Forensic tests determined that Amber's blood type was O and she was a nonsecretor. Appellant's blood is type B and he is a secretor. Approximately 8 percent of the population is comprised of type B secretors. The semen which was present in the victim's vagina was from a type B secretor. Additional vaginal swabs and reference blood samples from appellant and victim were sent to the Federal Bureau of Investigation's (FBI) laboratory in Washington D.C. for deoxyribonucleic acid (DNA) genetic analysis.

Dr. Dwight Adams, a special agent assigned to the FBI laboratory, performed DNA analysis on the evidence.[6] Dr. Adams concluded the DNA from the semen on the vaginal swabs matched the known blood sample of appellant. Using a data base from a Hispanic population, Dr. Adams noted that the likelihood of finding another unrelated Hispanic individual with a similar profile would be approximately 1 in 250,000.[7]

*Defense*

Appellant testified at trial. He said that he had consumed beer throughout the afternoon and evening and, by the time he arrived at the party at the mobilehome park, he was fairly intoxicated. While there, he continued to drink beer and mixed drinks. He testified that he remembered his argument

---

[5]Foxtails were found in the victim's hair, fist and hairband. Foxtails were also present inside and outside of appellant's shorts and in his underwear.

[6]The qualifications of Dr. Adams and the methods used in conducting the analysis will be discussed, in detail, in the portion of this opinion addressing appellant's contentions regarding DNA analysis admissibility.

[7]In the White population, the likelihood would decrease to 1 in 10,000,000. When a subject is half White and half Hispanic, the FBI would use the more conservative statistic applicable to the Hispanic population (here 1 in 250,000) to favor a defendant.

with Sandy and leaving the party with the intention of walking to his mother's house. He also recalled crisscrossing the road and lying down in front of the truck.

When Sandy returned with Amber, he attempted to hide and ran into the brush. He testified that Amber followed him but he told her that he and Sandy were having problems and that she should go home. According to appellant, he took Amber's flashlight and started walking away. He said that when Amber asked for the light, he turned and tossed it to her.

Throughout his testimony, appellant maintained he remembered nothing from the time he threw the flashlight until he woke up in the brush. Appellant said that, when he awoke, he did not walk back to North Fork along the dirt road but instead cut through an area of brush and trees. Appellant claimed to have met a man in tan pants and a white shirt who he assumed was a law enforcement officer and who accused him of kidnapping his sister. He also said that he saw a full-size pickup on the road when it was fairly light out.[8]

Appellant testified that the injury to his hand had occurred at work. Appellant denied telling investigating officers that he had not removed his underwear or clothes, and claimed that he had actually told them he did not "believe" he had undressed. He also said investigator Flores had mischaracterized his response to the question of how he would feel about being arrested. Rather than stating to Flores that it would be a mistake because there "wasn't enough proof," appellant testified that he told Flores that Flores would be making a mistake "because [he] didn't kill Amber."

Appellant also testified that he had, in the past, suffered blackouts and loss of consciousness after drinking excessively and that such episodes began to occur more frequently after he suffered a head injury in 1985. He also admitted that he told an investigator that alcohol made him violent.

Appellant's mother also testified for the defense. She said appellant and Amber had been close. Although appellant had scratches on him when he appeared at her home in the morning, the scratches did not appear to her to have been made by a person; she assumed he had been scratched by bushes. Mrs. Conston recalled that, when appellant learned his sister was dead, he put his head in her lap and cried.

Guy Clements was the final defense witness at trial. Mr. Clements was working as a newspaper delivery person on June 11, 1989. He testified that

---

[8]Appellant said that Detective Gauthier was mistaken in reporting that appellant had previously stated that he saw the truck after he had run into the brush away from Amber.

he was driving near the area where Amber's body was found, about 1:30 a.m., when he saw a red Datsun pickup stopped in the middle of the road. It appeared to him that there was a man inside the truck.[9]

DISCUSSION

I.

*DNA Identification Evidence*

Appellant contends the trial court erred in allowing the prosecution to present evidence of the results of the FBI's forensic DNA identification tests and the statistical significance of those results. According to appellant, the prosecution failed to meet its burden of showing that such forensic DNA identification testing is generally accepted in the relevant scientific community. (*People* v. *Kelly, supra,* 17 Cal.3d at p. 30; *Frye* v. *United States, supra,* 293 F. at p. 1014.)

Dr. Adams, a special agent with the FBI assigned to the DNA analysis unit of the FBI laboratory in Washington, D.C., was the sole witness at the *Kelly/Frye* hearing. Dr. Adams's subsequent testimony established that he was, at that time, a special agent with the FBI, assigned to the DNA analysis unit of the FBI laboratory in Washington, D.C. He had been assigned to the DNA analysis unit since its inception in 1988 and had previously worked for a unit involved in researching DNA analysis. His educational background included a bachelor of science degree in biology from Central State University in Oklahoma, a master of science degree in biology from Illinois State University and a Ph.D. in biology from the University of Oklahoma. Before working for the FBI, he had been a research assistant in biology at the University of Oklahoma. As an undergraduate he studied molecular biology, genetics population biology and biochemistry and as a graduate student, he completed courses from the University of Virginia in body fluid identification, molecular biology and DNA profiling. He was trained at the FBI Forensic Science Research and Training Center at Quantico, Virginia, in the area of DNA profiling and was also certified as a serologist by the FBI director. He testified that he frequently reviewed scientific literature in the field and attended every related symposium and lecture.

Additionally, he had published a number of articles in the area of DNA profiling and had coauthored chapters in three books entitled, Methods in

---

[9]On the morning that the crime was discovered, a year before trial, Mr. Clements reported that he had seen a yellow gold, newer model Nissan truck with a young White male inside.

Nucleic Acid, Advances in Forensic Sciences, and Chemical Society Symposium Series. The chapters dealt with the topic of DNA profiling and validation of procedures. Dr. Adams testified he was a member of the American Academy of Forensic Scientists and of the International Electrophoresis Society.

Dr. Adams testified he had performed the procedure known as DNA profiling on thousands of samples before ever working any cases. Additionally, he had performed the procedure in an excess of 600 cases. He had qualified as an expert in DNA analysis in 17 or 18 different states including California, and within California, he had previously qualified as an expert in Alameda County as well as Sonoma County. He had previously testified for the defense as well as the prosecution.

After describing his qualifications, Dr. Adams explained what DNA was, the process of DNA profiling, the specific procedures employed by the FBI, and the methods used by the FBI in establishing probability assessments.

The court found Adams qualified as an expert "when it comes to DNA," and found his testimony sufficient to establish the reliability of the procedure. The court further found correct procedures were employed and admitted the contested evidence.

A. *Waiver*

■ Respondent first asserts appellant has waived any challenge to the DNA evidence because of his failure specifically to object below and his failure to present any rebuttal evidence.[10] We reject respondent's assertion. "[An] evidentiary hearing was held in response to [appellant's] *Kelly/Frye* objection[s]" to the introduction of DNA evidence, and the trial "court's ruling covered all of the matters currently in dispute." (*People* v. *Cooper* (1991) 53 Cal.3d 771, 812 [281 Cal.Rptr. 90, 809 P.2d 865].)

B. *Kelly/Frye*

■ Under the *Kelly/Frye* rule, the proponent of expert testimony based on application of a new scientific technique must: establish that the technique or method is sufficiently established to have gained general acceptance in its field; offer the testimony of a properly qualified expert regarding the

---

[10]Trial counsel stated in part: "I am objecting to the testimony and presentation of any evidence or results of the DNA testing being done by the FBI. I feel a *Kelly/Frye* hearing is certainly necessitated in this particular case as the court and, I believe, counsel is aware, DNA testing and its reliability and validity are still certainly in question in the legal community as well as the scientific community."

technique and its application; and establish that correct scientific procedures have been used in the case in question. (*People* v. *Morris* (1991) 53 Cal.3d 152, 206 [279 Cal.Rptr. 720, 807 P.2d 949].)

Appellant asserts the prosecution failed to satisfy the requirements of *Kelly/Frye*. Appellant argues the present case is plagued with the same infirmities identified by the Supreme Court in *Kelly*. He asserts the testimony of only one expert is insufficient to establish general acceptance in the scientific community of DNA testing by restriction fragment-length polymorphism (RFLP) analysis as well as the use of genetic data base statistics. He further asserts that because the prosecution's expert had been working for the FBI for six years and was instrumental in developing procedures to be used in forensic DNA case work, he was not able to fairly and impartially assess the position of the scientific community on these issues.

Whatever merit appellant's contentions might have is overshadowed by *People* v. *Axell* (1991) 235 Cal.App.3d 836 [1 Cal.Rptr.2d 411] wherein the Second District Court of Appeal addressed the question of admissibility of DNA identification evidence. The court first intelligibly explained both the scientific theory underlying DNA typing and the statistical evaluation of the data obtained from DNA typing as follows:

"DNA, deoxyribonucleic acid, is a fundamental material which determines the genetic properties of all living things. All nucleated cells of every human being contain DNA. In 1952, scientists James Watson and Francis Crick won the Nobel Prize for their discovery of the structure of DNA. The molecule is composed of two parallel chain-like structures, a double helix, which has been described as a spiral staircase. The handrail and balustrade of the staircase is made up of repeated sequences of phosphate and deoxyribose sugar. Attached to the sugar links are four types of chemical bases—Adenine (A), Cytosine (C), Guanine (G), and Thymine (T). Pairs of these bases or 'base pairs' form the steps of the spiral staircase. [Citations.] Each A on a chain-like structure always pairs with each T on the other strand and each C on one strand always pairs with each G on the other. [Citations.] It is the order or sequence of the base pairs (the steps) that determines genetic traits of an individual life form and each human. No two human beings have identical sequences in all of its base pairs in its DNA except for identical twins.

"In a single molecule of DNA, there are approximately three billion of these base pairs. Within an individual, the DNA from the nucleus of every cell is identical. Thus, the sequence of base pairs in a cell from a strand of hair will be identical to the sequence of base pairs found in a skin cell from the same individual.

"Most of the DNA does not vary from person to person, thus creating such shared features as arms and legs. Other regions of DNA, however, vary distinctly from one person to another and it is these regions of the DNA molecule where the base pairs are arranged differently which make it possible to establish identity and differences between individuals. These variable regions of the DNA molecule are called 'polymorphic loci' or 'polymorphic sequences.' Every locus that is known has an official name and symbol assigned by the international Human Gene Mapping Workshop. . . .

"The human DNA molecule has 23 pairs of chromosomes, 22 from each parent and 2 sex-typing chromosomes, 1 chromosome in each pair inherited from each parent. Each chromosome has thousands of genes and each gene is located on a particular site on the chromosome. Each gene or segment of DNA material that produces a trait is called an allele. Thus, an allele is one of several forms of a gene, occupying a given locus on the chromosome. In variable regions of DNA, a pair of chromosomes is distinguished by different alleles—one from the mother and one from the father. If the mother and father each contribute the same general information for a particular trait, that locus is *homozygous*; when the genetic information differs, the locus is *heterozygous.*

". . . . . . . . . . . . . . . . . . . . . . . . . . .

" 'Restriction enzymes' are able to recognize a specific sequence of six base pairs along a strand of DNA. When the enzyme recognizes this particular sequence it cuts the DNA at that location. These enzymes enable the researcher to cut the long DNA molecule into shorter fragments which can be used for many research purposes and for DNA 'fingerprinting' or typing. The two strands of the DNA chain or staircase can also be separated or 'unzipped.'

"DNA typing, or restriction fragment-length polymorphism (RFLP) analysis, involves a number of steps: (1) *extraction and purification* of the DNA; (2) *fragmentation* by restriction enzymes; (3) *gel electrophoresis* in which a positive electrical charge to the bottom of an agarose gel on which a DNA sample is placed causes the DNA to move through the gel from the negative to the positive charge; (4) *Southern blotting* in which the gel and DNA in it are transferred to a nylon membrane for easier handling; (5) *hybridization* in which the DNA pattern unique to the individual is identified by use of radioactively tagged probes, 'unzipped' DNA segments of a known length and sequence, designed to seek out a predetermined locus in a polymorphic

region of the DNA and band with a like segment of DNA; and (6) *autoradiography* in which a film is developed on top of the nylon membrane, revealing the location of the DNA by bands on the X-ray film, called an autoradiogram or autorad. Use of a single probe produces two bands on the autorad. Thus, running four different probes at the same time results in eight bands.

"The autorads must be interpreted and the bands produced by the migration of DNA in the gel in different lanes examined to ascertain if they match. Essentially the bands on the autorad from the victim's, suspect's, and crime scene evidence samples are 'eyeballed' to see if they match within a certain measurement. If a match is declared, the likelihood that a match is unique must be determined. A match is said to occur if the sizes and number of the detected DNA fragments in various lanes are indistinguishable within a permissible degree of error. To calculate the permissible degree of error, Cellmark uses 'resolution limits' as a unit of measurement to ascertain the 'bin' or frequency at which an allele occurs in the population data base.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"To make a statistical evaluation of the data obtained from a DNA typing, it is necessary to know how frequently in the population a band of a certain size will be found, a question answered according to the principles of population genetics. Each probe recognizes a pair of bands—one from each parent. The probability of the combination of two particular bands recognized by one of the probes is calculated by multiplying the product of the frequencies of the two bands by two. The probability of the band patterns from all four loci is determined by multiplying the products from all four loci. This is known as the 'product' or multiplication rule.

"The validity of this procedure presupposes that each fact observed, and entering into the calculation, is random and independent of the others, or adjustments are made for deviations from conditions known as 'Hardy-Weinberg equilibrium' and 'linkage equilibrium.' [Citation.] The Hardy-Weinberg principle is an algebraic equation that describes the genetic equilibrium within a population, assuming random mating. . . . A homozygote is an individual who has inherited the same allele (or same length allele) from both parents. If the incidence of homozygosity far exceeds the expected frequency of that condition, then the data base population is not in Hardy-Weinberg equilibrium. [Citation.]

"As explained in *People* v. *Castro*, [(1989)] *supra*, [144 Misc.2d 956] 545 N.Y.S.2d 985, 'Population genetics derives its force for identification purposes from the small likelihood that a given polymorphic or anonymous

allele will occur randomly in the relevant racial population. For the alleles to be random in the gene pool two pre-conditions must exist. First, the occurrences of the allele must not be caused by linkage disequilibrium, and second, the relevant racial population as a whole must be in Hardy-Weinberg equilibrium. For these purposes, a population is in equilibrium when there is no correlation between the allele contributed by the mother and the allele contributed by the father at a particular locus. That is, the alleles are independent of each other. Thus, when two alleles under examination appear on a single chromosome of the parent, the chance that the child received both alleles randomly is lessened. The reason for this is that there is an increased chance that alleles on a single chromosome will be passed on together and then become part of the child's genome [i.e., total genetic information contained in an organism's or individual's gene]. This is more likely than if the alleles were located on different chromosomes. Hence, there is less chance that the alleles were transmitted randomly. When this phenomenon occurs the alleles are linked, and for this allele the population is in linkage disequilibrium. Where the alleles occur on different chromosomes, linkage is not expected to occur except due to external forces of nature. Where there is no linkage, the appearance of the allele in a child may be said to have occurred randomly. When this occurs, the population is not in linkage disequilibrium. [¶] For purposes of Hardy-Weinberg equilibrium it is assumed that allele frequencies will remain constant within a population from generation to generation as long as mating remains random. . . . [¶] However, if the population is not in Hardy-Weinberg equilibrium then the alleles are not independent. Thus, the degree of dependency between the alleles must be calculated. Calculations may also be obtained by finding the actual, not projected, frequency in the population. This may be accomplished using larger populations, reference populations to determine genotype frequencies, or by considering only one allele. Conservative or reduced calculations may also correct the Hardy-Weinberg deviation problems. With deviations from Hardy-Weinberg equilibrium the frequency of the allele in the population, and thus the uniqueness of the fingerprint, can be in question but this is not necessarily related to the validity of the match.' [Citation.]" (*People* v. *Axell, supra,* 235 Cal.App.3d at pp. 844-848, fns. omitted, italics original.)

After carefully examining both the expert testimony presented and cases from other states, the *Axell* court concluded "[c]redible testimony here, as well as review of the above cited decisions, reveals that the steps of DNA fingerprinting involve scientific principles and technology all of which have gained general acceptance in the scientific field in which they belong." (*People* v. *Axell, supra,* 235 Cal.App.3d at p. 856.)

Appellant recognizes that "once a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a

published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community." (*People* v. *Kelly, supra*, 17 Cal.3d at p. 32.)

Appellant contends: "[s]ince [the time *Axell* was decided] many, many scientists have come forward to criticize the FBI's methodology." In support of his contention that DNA identification is not generally accepted, he asks the court to take judicial notice of numerous articles.[11]

---

[11]Respondent opposes this request but has filed its own request for judicial notice should appellant's be granted. Both requests are granted. However, respondent's request that judicial notice be taken of the transcripts in *People* v. *Axell, supra*, 235 Cal.App.3d 836 and *People* v. *Barney* (1992) 8 Cal.App.4th 798 [10 Cal.Rptr.2d 731] is denied.

The following documents have been submitted: 1) Thompson and Ford, *Is DNA Fingerprinting Ready for the Courts?* (Mar. 31, 1990) New Scientist, pages 38-43; 2) Lander, *DNA Fingerprinting on Trial* (June 15, 1989) Nature, pages 501-505; 3) Neufeld and Colman, *When Science Takes the Witness Stand* (May 1990) Scientific American, volume 262, No. 5, pages 46-53; 4) Farley and Harrington, Forensic DNA Technology (Lewis Publishers, Inc. 1991): chapter 7—Thompson and Ford: *The Meaning of a Match: Sources of Ambiguity in the Interpretation of DNA Prints*, pages 93-151; 5) Banbury Report 32: DNA Technology and Forensic Science (1989)—Lander, *Population Genetic Considerations in the Forensic Use of DNA Typing*, pages 143-156; 6) Cohen, *DNA Fingerprinting for Forensic Identification: Potential Effects on Data Interpretation of Subpopulation Heterogeneity and Band Number Variability* (1990) 46 Am. J. Human Genetics 358-368; 7) DNA: Report of New York State Forensic DNA Analysis Panel (Sept. 6, 1989); 8) Congress of the United States Office of Technology Assessment, Genetic Witness: Forensic Uses of DNA Tests (July 1990).

Adams et al., *Deoxyribonucleic Acid (DNA) Analysis by Restriction Fragment Length Poloymorphisms of Blood and Other Body Fluid Stains Subjected to Contamination and Environmental Insults*; Budowle and Stafford, *Response to Expert Report by D.L. Hartl, Submitted in the Case of United States v. Yee*; Budowle and Stafford, *Response to Population Genetic Problems in the Forensic Use of DNA Profiles by R. C. Lewontin, Submitted in the Case of United States v. Yee* (July 1991) 18 Crime Laboratory Dig. 109; Budowle et al., *Fixed-Bin Analysis for Statistical Evaluation of Continuous Distributions of Allelic Data from VNTR Loci, For Use in Forensic Comparisons*; Budowle et al., *Validation with Regard to Environmental Insults of the RFLP Procedure for Forensic Purposes*; Budowle et al., *Fragment-Length Polymorphisms for Forensic Science Applications*; Statement of the Working Group on Statistical Standards for DNA Analysis (July 1990) 17 Crime Laboratory Digest 53; Chakroborty et al., *Apparent Heterozygote Deficiencies Observed in DNA Typing Data and Their Implications in Forensic Applications*; Giusti et al., *Application of Deoxyribonucleic Acid (DNA) Polymorphisms to the Analysis of DNA Recovered from Sperm*; Guidelines for a Quality Assurance Program for DNA Analysis (Apr. 1991) 18 Crime Laboratory Digest 44; *Invited Editorial: Research on DNA Typing Catching Up with Courtroom Application* (Letters to the Editor of the American Journal of Human Genetics); Lewis et al., *Restriction Fragment Length Polymorphism DNA Analysis by the FBI Laboratory Protocol Using a Simple, Convenient Hardware*

Appellant further contends that *People* v. *Axell, supra,* 235 Cal.App.3d 836 is distinguishable and thus not controlling. According to appellant the *Axell* court considered the procedures employed by Cellmark Laboratory (Cellmark) and not those utilized by the FBI.

Relying on *People* v. *Farmer* (1989) 47 Cal.3d 888 [254 Cal.Rptr. 508, 765 P.2d 940], respondent asserts any issue regarding the procedures followed in the instant case go to the weight of the evidence and not its admissibility.

In *Farmer,* the defendant argued that shoe print evidence and photographs of shoe prints did not meet "the requirements of the *Kelly/Frye* test." (47 Cal.3d at p. 912.)

"Defendant urges us to hold that the evidence of the footprints and the analysis based on it fail to meet the requirements of the *Kelly/Frye* test because the investigation—especially the photographing of the impressions —was carried out in a defective manner.

"Defendant relies for this conclusion on testimony by Springer and another prosecution witness that the footprint evidence was not collected in a scientifically acceptable manner. He mischaracterizes their statements. Although Springer felt that better photographs could have been taken of the prints, she also testified that her identification of at least one impression as made by defendant's boot was conclusive. This hardly renders the identification unreliable. *Furthermore, the Kelly/Frye rule tests the fundamental validity of a new scientific methodology, not the degree of professionalism with which it is applied. [Citation.] Careless testing affects the weight of the evidence and not its admissibility, and must be attacked on cross-examination*

---

*System;* McNally et al., *Evaluation of Deoxyribonucleic Acid (DNA) Isolated from Human Bloodstains and Exposed to Ultraviolet Light, Heat, Humidity, and Soil Contamination.*

Hartl, Expert's Report in the Case of United States v. Yee, et al.; Lewontin, Population Genetic Problems in the Forensic Use of DNA Profiles; D'Eustachio, Expert's Report in United States v. Yee, et al.; Hagerman, Expert's Report in United States v. Yee, et al.; Shapiro *Imprints on DNA Fingerprints,* Nature (Sept. 12, 1991); Cohen et al., *Forensic DNA Tests and Hardy-Weinberg Equalibrum,* Science (Aug. 30, 1991); Lander, *Invited Editorial: Research and DNA Typing Catching Up With Courtroom Application* (1991) (and letters in response) 48 Am. J. Human Genetics 819; *Critic of "Genetic Fingerprint" Testing Tells of Pressure to Withdraw Paper,* New York Times (Dec. 20, 1991) p. A-16.

While we take judicial notice of the submitted documents we note that such notice only concludes that such articles exist and not whether the text is factually or scientifically accurate. For our purposes they demonstrate the nature and extent of the controversy, not the resolution of the controversy.

*or by other expert testimony.* Finally, defendant does not show that he raised a *Kelly/Frye* objection at trial. For all these reasons the contention must fail." (47 Cal.3d at pp. 912-913, italics added.)

Respondent's contention was rejected in *People* v. *Axell, supra,* 235 Cal.App.3d at page 862. There the court stated:

"We agree with appellant that the brief statement in *People* v. *Farmer, supra,* 47 Cal.3d 888, did not intend to overrule the long-established 'third prong' of *Kelly* that requires proof that correct scientific procedures were used in the particular case. [Citation.] In *Farmer,* it was only on appeal that the defendant even raised a '*Kelly/Frye*' argument attacking the manner in which photography was carried out. [Citation.] We note that federal courts and other jurisdictions have criticized *Frye* for failing to include this third factor and have included it in a determination of reliability in the particular case before them. [Citations.]

"Due to the complexity of the DNA multisystem identification tests and the powerful impact that this evidence may have on a jury, satisfying *Frye* alone is insufficient to place this type of evidence before a jury without a preliminary critical examination of the actual testing procedures performed. [Citations.] Since the California Supreme Court was not called upon to decide the admissibility of a new scientific procedure in *Farmer,* we find that case distinguishable on its facts. [Citation.] Moreover, the court still listed this third requirement as subject of the hearing on admissibility in *People* v. *Kaurish* (1990) 52 Cal.3d 648, 688 . . . , even though it stated that *careless* testing affects the weight of the evidence and not its admissibility in *People* v. *Cooper, supra,* 53 Cal.3d 771, 814 . . . . Accordingly, we adhere to the traditional view that the third prong of the *Kelly* test is also the subject of a pretrial hearing on the question of admissibility." (235 Cal.App.3d at p. 862.)

*Kelly* states:

". . . admissibility of expert testimony based upon the application of a new scientific technique traditionally involves a two-step process: (1) the *reliability of the method* must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly *qualified as an expert to give an opinion* on the subject. [Citation.]. Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case." (*People* v. *Kelly, supra,* 17 Cal.3d at p. 30.)

Essentially the court in *Axell* looks upon this last statement in *Kelly* as creating a third prong to the determination of whether the process or

technique in the case in controversy is scientifically reliable and therefore admissible. While we see the issue somewhat differently than the court in *Axell*, our conclusion is basically the same for the purposes of this case. In our view, respondent's argument essentially is that once the general RFLP test has passed *Kelly/Frye* scrutiny, then how the test was performed in the case before the court goes to weight. They, in effect, argue that under *Farmer* and *People* v. *Cooper*, *supra*, 53 Cal.3d 771, 814, while a particular scientific technique might be validated under *Kelly/Frye*, the question of whether the evidence in the particular case was properly tested according to that technique is a separate non-*Kelly/Frye* issue that goes to weight.

However, whether correct scientific procedures were employed in a particular case assumes there is a correct scientific procedure for performing this scientific test. We view this as intrinsic to our high court's expression of the *Kelly/Frye* criteria. Therefore, it would be incorrect to say that only the concept of RFLP testing must pass *Kelly/Frye* muster, and that the particular standardized protocol utilized to perform that RFLP test as to each individual step need not be included within that standard. This is the point respondent's argument overlooks.

*Axell* did not resolve whether there was a standard protocol for performing the RFLP test. *Axell* resolved that the manner in which Cellmark performed the test was acceptable under *Kelly/Frye*. Like the court in *Axell*, we conclude that correctness of scientific procedure is part of the *Kelly/Frye* analysis. We deem the factor of correctness of the scientific procedure as implicit in the determination of the reliability of the method.

■ The function of the *Kelly/Frye* criteria is to assure reliability of the particular technique. This is, in part, to alleviate concern that exists over accepting as true the results of a process, theory, or technique that we are not educated to understand in its entirety. *Kelly* notes that reliability of method looks to the concept expressed in *Frye* that the new scientific technique must be "*sufficiently established to have gained general acceptance in the particular field to which it belongs.*" (*People* v. *Kelly*, *supra*, 17 Cal.3d at p. 30, italics in the text.) This is not, in our view, simply a process of adding up the number of assenting and dissenting voices in the relevant scientific community. In addressing the same reliability issue concerning voice spectrographic analysis, the court in *United States* v. *Williams* (1978) 583 F.2d 1194 noted:

"A determination of reliability cannot rest solely on a process of 'counting (scientific) noses.'

". . . . . . . . . . . . . . . . . . . . . . .

". . . In testing for admissibility of a particular type of scientific evidence, whatever the scientific 'voting' pattern may be, the courts cannot in any event surrender to scientists the responsibility for determining the reliability of that evidence." (583 F.2d 1194, 1198.)

Thus, the question is not simply whether there is general acceptance but also "why" is there general acceptance of the test as reliable. As noted in *Williams*, there are a number of factors that may be considered in this regard.

"One indicator of evidential reliability is the potential rate of error.

". . . . . . . . . . . . . . . . . . . . . . . . .

"Another reliability indicia is the existence and maintenance of standards.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"A third reliability factor can be the care and concern with which a scientific technique has been employed, and whether it appears to lend itself to abuse.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"A further indication of the reliability . . . is [the test's] analogous relationship with other types of scientific techniques, and their results, routinely admitted into evidence.

". . . a convincing element in determining reliability is the presence of 'failsafe' characteristics." (583 F.2d at pp. 1198-1199.)

*Kelly/Frye* resolves not just that a technique is reliable but also that the manner in which the technique is performed assures its reliability. Therefore, the procedure by which the technique or process is performed is part of the *Kelly/Frye* evaluation. If someone performs the test in a manner distinct from the procedures used when the test has successfully undergone *Kelly/Frye* scrutiny, that different procedure must itself assure reliability. That assurance of reliability comes through *Kelly/Frye* scrutiny. This is a separate issue from whether a test properly followed a technique that had passed *Kelly/Frye* examination.

Therefore, we view the scientific procedure used in the technique as part of the evaluation of the reliability of the method. *Farmer* and *Cooper* do not address reliability of method which is the *Kelly/Frye* question. Rather, they address how well a particular method was followed. This is not a *Kelly/Frye*

question, nor is it the issue that *Kelly* was addressing when it referred to correct scientific procedures being used in the particular case. (See *People* v. *Adams* (1975) 53 Cal.App.3d 109, 115-116 [125 Cal.Rptr. 518], cited on this issue by *Kelly, supra,* 17 Cal.3d 24, 30.)[12]

From the standpoint of judges confronted with assessing whether a particular scientific technique meets legal standards, to separate the process by which a test can be done reliably from the question of whether a particular test in general is reliable for scientific purposes creates an unresolvable distinction. It is evident that as laypersons we must rely upon the scientific community as to what process is generally accepted to ensure reliable results. We cannot by ourselves ascertain whether there are different ways of performing the steps involved in the RFLP test. However, we are charged with the responsibility of assessing the validity of those methods by reference to the relevant scientific community.

In the context of the *Axell* case, the reviewing court and the trial court concluded that the test performed by Cellmark passed *Kelly/Frye* muster. Assuming the manner in which Cellmark performs the RFLP test has passed *Kelly/Frye* scrutiny then, under the *Kelly* case, the proponent of such evidence in subsequent cases would not need to re-address the *Kelly/Frye* foundation. (*People* v. *Kelly, supra,* 17 Cal.3d at p. 32.) However, assuming the RFLP test were to come up before a different trial court having the benefit of the *Axell* decision, and the protocol for performing the test was distinct from the Cellmark procedure, then the trial court would not be relieved from *Kelly/Frye* scrutiny of that distinct protocol. The reason this would not be an issue of weight is because the question would not be whether a particular method deemed reliable was followed, but whether the particular method followed may be deemed reliable.

■ Appellant argues that Cellmark uses different protocols, different restriction enzymes, different probes, different matching criteria and different data bases to arrive at its conclusions than are used by the FBI.[13] Absent some demonstration that the FBI's protocol for performing the RFLP test is the same as Cellmark's, we are unable to conclude that the FBI protocol in performing the RFLP test has met with the same acceptance in the scientific

---

[12]The Attorney General states: "Plainly, if a court cannot admit evidence produced by scientific testing unless it first determines that the test results are reliable, a *Kelly/Frye* hearing would be required in each and every case. Such a conclusion is contrary to the tenets of *Kelly* that once the admission of a new scientific technique is affirmed on appeal, the precedent controls subsequent trials." Respondent's argument would have some merit if one of the *Kelly/Frye* criteria addressed how well a particular method was followed. We hold that is not, however, a *Kelly/Frye* criteria.

[13]The record and the judicially noticed documents generally support this contention.

community as the Cellmark protocol had at the time *Axell* was decided. Thus, *Axell* is dispositive of the proponent's *Kelly/Frye* foundation for the Cellmark test but is not necessarily dispositive of a different protocol designed to reach the same conclusion utilizing the RFLP test.

For purposes of the reliability of the RFLP test, as noted in the National Research Council (NRC) report, it is not the individual steps for detecting DNA variation that is in question but rather the protocol for performing each step of the test.

In DNA testing pursuant to the RFLP method, the latest report on DNA analysis by the NRC (NRC, DNA Technology in Forensic Science (National Academy Press, 1992)) concludes that "[t]he current laboratory procedure for detecting DNA variation (specifically, single-locus probes analyzed on Southern blots without evidence of band shifting) is fundamentally sound, although the validity of any particular implementation of the basic procedure will depend on proper characterization of the reproducibility of the system (e.g., measurement variation) and the inclusion of all necessary scientific controls." (*Id.* at p. 149.)[14] The essence of the NRC report is that there is a need for standardization of laboratory procedures and proficiency testing to assure quality control with respect to DNA laboratory analysis. (*Id.* at pp. 16, 98, 108-109.)

Simply put, on this record we are unable to evaluate whether or not the purported differences between the methods employed by Cellmark and those utilized by the FBI have any scientific consequence at all with respect to the reliability of the process or are simply the distinction between using a brand name drug and its generic equivalent. This is not to say that the protocol that has been established by the FBI is necessarily deficient or unreliable. It is evident that the FBI has attempted to set extremely high protocol standards through their technical working group on DNA analysis (TWGDAM) which is "composed of scientists, not only in the forensic crime laboratory community, but also scientists from academics, as well, that periodically meet together to discuss certain issues on RFLP analysis."[15]

Respondent unpersuasively contends that Dr. Adams's testimony was sufficient to establish that the procedures employed by the FBI are reliable

---

[14]Pursuant to notice to the parties according to the provisions of Evidence Code sections 452 and 453, we take judicial notice of the NRC report for purposes of establishing that such a report has been made together with the contents of the report. We do not notice the report for the truth of the comments contained therein.

[15]The NRC report recommends the use of TWGDAM standards which is of itself very compelling, but this is not our issue to resolve. (See the NRC, DNA Technology in Forensic Science, *supra*, at p. 106.)

and generally accepted in the scientific community. According to respondent:

"Dr. Adams was specifically questioned about the F.B.I.'s standards and guidelines on cross-examination in this case. He testified that the F.B.I. met or exceeded all guidelines established by the Technical Working Group on DNA Analysis Methods (known as TWGDAM). Further, Dr. Adams testified that the F.B.I.'s proficiency records were available for review to the defense." (Fn. omitted.)

In *Axell*, several expert witnesses testified regarding the protocols used by Cellmark. Dr. Robin Cotton, the manager of research and development for Cellmark, testified that she was "familiar with the standard operating procedures used at Cellmark and [had] reviewed the notes of Lois Tonelli, the technician who actually performed the procedures. She concluded that Ms. Tonelli had followed the procedures set up within the laboratory and that the methods used by Cellmark to calculate frequencies of banding patterns is one which is accepted in the scientific community." (*People v. Axell, supra,* 235 Cal.App.3d at p. 849.)

Dr. Cotton's testimony was, however, corroborated by several other independent expert witnesses. First, Dr. Richard Roberts, "the world's leading authority on enzyme restriction" (235 Cal.App.3d at p. 848), testified that he had reviewed "the protocols used by Cellmark labs and laboratory notes in this case . . . [and] was of the opinion that the procedures set forth in the protocol were recognized as reliable in the scientific community, and, as performed in this case, conformed to the protocols." (*Id.* at p. 849.) Second, "Doctor Kidd testified that he had examined Cellmark's protocol and lab notes on this case. In his opinion, the protocols contained standard procedures for performing the RFLP process and the technician who tested the DNA in this case correctly followed the procedures outlined in the protocols." (*Ibid.*)

Unlike *Axell*, the only testimony regarding the procedures employed by the FBI in the present case was presented by an FBI agent who had been assigned to the DNA unit since its inception. A similar showing was deemed inadequate in *People v. Brown* (1985) 40 Cal.3d 512, 533 [220 Cal.Rptr. 637, 709 P.2d 440]. *Brown* involved the typing of semen stains by electrophoresis. The prosecutor offered the testimony of two Department of Justice criminalists who had analyzed the stains. The court stated:

"[They] were competent and well-credentialed forensic technicians, but their identification with law enforcement, their career interest in acceptance

of the tests, and their lack of formal training and background in the applicable scientific disciplines made them unqualified to state the view of the relevant community of *impartial scientists*. [Citation.] Moreover, neither witness backed up his or her opinion with a discussion of the relevant scientific literature. [Citation.]" (40 Cal.3d at p. 533, italics in original.)

Here, appellant concedes Dr. Adams "certainly was qualified to testify as to the procedures used and protocols followed by the FBI . . . ." Nonetheless, despite Dr. Adams's stellar qualifications, we do not believe his testimony standing alone establishes that the procedures employed by the FBI satisfy the requirements of *Kelly/Frye*. Prior to admitting testimony as potentially damaging as DNA forensic identification, the prosecutor should have been required to demonstrate through the testimony of at least one impartial expert witness that the protocols and/or procedure of the FBI were generally accepted within the scientific community as reliable.[16] This is particularly so since the resolution of the *Kelly/Frye* issue regarding the FBI DNA test will resolve that issue for the trial courts. (See *People* v. *Kelly*, *supra*, 17 Cal.3d at p. 32.)

### Viability of Data Base Study

In addition to the question we have addressed concerning the RFLP test itself and the protocols utilized by the FBI, there remains an equally important question concerning the data base used in this case to calculate the probabilities with which certain band patterns can be expected to occur. As we have noted in quoting *Axell*'s cogent explanation of the RFLP process, once the step of autoradiography is performed, the bands produced by the migration of DNA in different lanes of the gel are examined to ascertain if they match. Then

"To make a statistical evaluation of the data obtained from a DNA typing, it is necessary to know how frequently in the population a band of a certain size will be found, a question answered according to the principles of population genetics. Each probe recognizes a pair of bands—one from each parent. The probability of the combination of two particular bands recognized by one of the probes is calculated by multiplying the product of the

---

[16]The prosecution was not entirely at fault in this regard. The record reflects the prosecutor apparently was led to believe that defense counsel was not going to challenge the admissibility of the DNA identification evidence. After Dr. Adams testified at the *Kelly/Frye* hearing, the prosecutor conceded that this testimony alone was not sufficient to satisfy the requirements of *Kelly/Frye*. The prosecutor claimed defense counsel had indicated she would not challenge the admissibility of the DNA evidence. The prosecutor requested a continuance in order to obtain further expert testimony to support a finding that DNA forensic testing was generally accepted in the scientific community. The court denied the prosecutor's request.

frequencies of the two bands by two. The probability of the band patterns from all four loci is determined by multiplying the products from all four loci. This is known as the 'product' or multiplication rule." (*People* v. *Axell*, *supra*, 235 Cal.App.3d at p. 847, fn. omitted.)

In order to calculate the statistical significance of the match within a particular racial or ethnic population, tests are performed to determine the frequency of appearance of the different bands within the target population. Thus, a data base would be created by selecting a number of people from the relevant population which would be, theoretically, the same population to which the suspect belonged. Therefore, if the suspect was Hispanic then the Hispanic data base would be employed to establish a frequency of occurrence of a given band pattern within the Hispanic population. The underlying theory behind all of this is that the ratio of band patterns will vary among different racial and ethnic groups. In other words, while a band pattern may not be distinct to particular racial or ethnic groups, it may occur with different frequency within different racial or ethnic groups. For purposes of illustration, a particular band pattern may appear 3 percent of the time in the Black population, 5 percent of the time in the Hispanic population and 7 percent of the time in the non-Hispanic Caucasian population.[17]

It is around this theory that controversy rages. A data base created from the general population would show the frequency of occurrence of a given defendant's specific banding patterns compared to the perpetrator without regard to race or ethnic background. As we understand the areas of contention, the dispute revolves around the question of whether or not a racial or ethnic population group chosen to represent the data base accurately reflects the group within which the suspect should be placed. The literature[18] reflects that a number of prominent scientific figures conclude that selection of the data base for a specific ethnic/racial group (the Black population or the Hispanic population, etc.) fails to consider the concept of subgrouping. Generally speaking, the selection of a data base from a general population group (Black) as opposed to a subgroup (Blacks of Nigerian descent, for illustration purposes) is predicated on a concept of random mating within the general group without regard to religion, ethnicity and geography. This process of random mating in general would conclude that the specific population is in linkage equilibrium. The concept of subgrouping assumes that within each ethnic/racial population group there are subgroups that tend

---

[17]These percentages are simply for the purposes of illustration and should in no way be assumed as reflective of the actual percentages of recurrence of band patterns. Generally speaking, it is our understanding that the differences between percentages of occurrence of band patterns are extremely small in mathematical terms but significant in genetic terms.

[18]See footnote 11, *ante.*

to mate within the specific subgroup (mating endogamously) based upon such factors as religion or like ethnicity or geographical differences, etc. Subgrouping would assume that based upon actual mating practices, as opposed to general mating practices, genetic differences would develop between subgroups. Therefore, subgroups (Puerto Rican Hispanics, for example) within a general population (Hispanic, for example) would show significant differences in the frequency of a given allele pattern which are reflected in the banding pattern.

*Axell* utilized an ethnic data base to reach a statistical probability. *Axell* concluded the "calculation of statistical probability is an integral part of the process and the underlying method of arriving at that calculation must pass muster under *Kelly/Frye*." (*Axell, supra,* 235 Cal.App.3d at pp. 866-867.) The court in *Axell* then determined the data base in that case was acceptable. However, *Axell* did not specifically resolve the question of whether the effect or lack of effect of subgrouping was generally accepted in the scientific community. The record before us utterly fails to address this issue.[19]

From our viewpoint, resolution of this conflict to the extent one theory or the other is generally accepted is necessary before conclusions may be accepted from the data bases involved for the purposes before us. Can genetic theory constitute a "new scientific technique" for purposes of *Kelly/Frye*?

"While the standards imposed by the *Kelly/Frye* rule are clear, the definition of a 'new scientific technique' is not. In *Kelly, supra,* . . . for example, the parties did not dispute that the *Frye* test applied to an identification process in which an expert analyst compares 'voiceprints,' or graphs of human voices, produced by a 'spectrograph' machine. Because the inventions and discoveries which could be considered 'scientific' have become virtually limitless in the near-70 years since *Frye* was decided, application of its principle has often been determined by reference to its narrow 'common sense' purpose, i.e., to protect the jury from techniques which, though 'new,' novel, or ' "experimental," ' convey a ' "misleading aura of certainty." ' [Citations.]

"This approach has produced two discernible themes. First, *Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or in part, on a technique, process, or theory which is *new* to science and, even more so, the law. The courts are willing to forego admission of

---

[19]This issue has been addressed in courts outside this state with respect to the FBI's procedures. See *U.S. v. Jakobetz* (D.C. Vt. 1990) 747 F.Supp. 250, 259-261. However, the record here does not support or contradict the conclusions that the *Jakobetz* court reached.

such techniques completely until reasonably certain that the pertinent scientific community no longer views them as experimental or of dubious validity. This all-or-nothing approach was adopted in full recognition that there would be a ' "considerable lag" ' between scientific advances and their admission as evidence in a court proceeding. [Citation.]

"The second theme in cases applying *Kelly/Frye* is that the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data. Lay minds might easily, but erroneously, assume that such procedures are objective and infallible. [Citations.]" (*People* v. *Stoll* (1989) 49 Cal.3d 1136, 1155-1156 [265 Cal.Rptr. 111, 1783 P.2d 698].)

We regard the dispute concerning genetic structure and substructure as subject to *Kelly/Frye* analysis. In our view, however, once the underlying theory of genetics is accepted regarding broad population groups vis-à-vis subgrouping then the criteria for the appropriate data base will be settled. In order for the data base to be reliable the theory of genetics upon which it is predicated must be an established scientific principle which we assess by its having gained general acceptance in the particular field to which it belongs.

■ "The question of how to characterize the 'general acceptance' issue under *Kelly/Frye* for purposes of defining appellate review of a trial court's determination has not been clearly stated in the case law. We believe, however, that 'general acceptance' is best described as a mixed question of law and fact subject to limited de novo review. The issue, recently paraphrased as whether 'a consensus of scientific opinion has been achieved [citations] is factual but not entirely so for purposes of review. The trial court's determination cannot be sustained, for example, on a mere finding that the record contains ' "sufficient evidence" ' of the reliability of the challenged method. [Citations.]

"The reviewing court undertakes a more searching review—one that is sometimes not confined to the record. Because it is impractical to parade a true cross-section of scientists before the court, the scientific literature may be considered on the ultimate issue of consensus. '[F]or this limited purpose scientists have long been permitted to speak to the courts through their published writings in scholarly treatises in journals. [Citations.] The courts view such writings as "evidence," not of the actual reliability of the new scientific technique, but of its acceptance *vel non* in the scientific community . . . . [I]f a fair overview of the literature discloses that scientists significant

either in number or expertise publicly oppose [the technique], the court may safely conclude there is no such consensus at the present time.' [Citation.] Law articles, too, may be considered for that purpose. [Citation.] This looking beyond the record can help end case-by-case controversy on this subject [citation] and is especially justified by the realization that 'once a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community.' [Citation.]" (*People* v. *Reilly* (1987) 196 Cal.App.3d 1127, 1134-1135 [242 Cal.Rptr. 496].)

In his paper, Population Genetic Problems in the Forensic Use of DNA Profiles,[20] Professor R. C. Lewontin of Harvard University states his position regarding the need to account for substructural deviation within the general population.

"The problem is whether a valid and reliable numerical estimate can be made, given current data, of the probability that an observed profile of DNA size variants from VNTR's would match the profile from a randomly chosen individual. This problem consists of two related questions:[21]

"1. What is the reference population from which the randomly chosen individual is to be taken?

"2. How are data from separate VNTR loci to be combined so as to give a probability for a profile composed of 2, 3, 4, etc. loci?

"Those, like the FBI, who wish to use VNTR profiles for identification claim that a reasonable numerical estimate can be made using currently available data. Their answer to the two questions posed are as follows:

"1. Two reference populations have been established, a 'Caucasian' and a 'Black' population (presumably an 'Hispanic' population will also be sampled at some time). Data have been gathered on the frequency of alternative VNTR alleles for a number VNTR loci in several samples. For 'Caucasians' there are 5 samples from the United States and Canada which are in good agreement with each other for the frequency distributions of the observed banding patterns. It is asserted that North American 'Caucasians' and 'Blacks' each are homogeneous random mating populations within themselves, so that the reference samples so far gathered can be taken as a

---

[20]See footnote 11, *ante.*

[21]VNTR's are the DNA genetic markers utilized to determine frequency of allele pattern.

good picture of the appropriate reference populations from which to make probability statements.

"2. Because 'Caucasians' and 'Blacks' are internally random mating groups, and because the different VNTR loci are on different chromosomes and therefore assort independently, a valid estimate of multiple VNTR pattern frequencies in the populations can be arrived at by multiplying the frequencies of the separate VNTR loci. In the language of population genetics, the loci are in *linkage equilibrium* (*gametic phase balance*).

"I will demonstrate below that both of these claims are incorrect and are based on a misunderstanding of population genetic theory and, more important, ignorance of a considerable body of undisputed fact about the genetic substructure within 'Caucasian' and 'Black' (and 'Hispanic') populations. That is, the *census* populations 'Caucasian', 'Black' and 'Hispanic' are each made up of multiple *biological* populations. As a consequence, *with currently available data, no valid estimate of population probabilities can be drawn, and it cannot be stated whether the estimates that are currently calculated will be biased for or against a particular defendant.* .

"Finally I will explain what source of data need to be gathered to make valid probability estimates in particular cases.

*"Some Theoretical Misunderstandings*

"Before turning to what is actually known about human population structure we need to clear up several simple misunderstandings that have led to confusion in this matter.

". . . . . . . . . . . . . . . . . . . . . . . . . .

*"Genetic Substructure in Actual Populations*

"Let us now turn to the main issue, which is whether, in fact, there is enough genetic substructure within the North American 'Caucasian' (or 'Black' or 'Hispanic') population to make estimates of genotype probabilities seriously unreliable and inaccurate in unpredictable directions. To repeat the question raised at the beginning: 1) can we use a single pooled 'Caucasian' sample to estimate allele frequencies of individual VNTR's and 2) can we estimate the probabilities of multiple genotypes by multiplying frequencies from separate VNTR's? The answers to these questions cannot be given from the information on VNTR frequencies themselves, since no investigation has ever been made of genetic substructure using these pieces of DNA.

We must then use the large body of data on blood group genes, and protein coating genes, together with the data on immigration and marriage patterns to show what kind of genetic substructure exists. In the end, however, as I discuss below, what needs to be done if DNA profiles are to be used for making probability statements in a forensic context, is to go out and get the data on VNTR's directly.

"There will be significant genetic substructure among biological sub-populations in a conglomerate population like the 'Caucasians' of North America if the following things are true:

"1. There was genetic differentiation among the ancestral populations that contributed the immigrants to the population in question:

"2. Only a few generations have passed since the mixing; and/or

"3. There is pronounced endogamy such that descendants of the original immigrants tend to marry each other rather than forming a large panmictic biological 'melting pot.'

"In fact, all three of these conditions are true *within* the North American 'Caucasian', 'Black' and 'Hispanic' census populations. Thus these census populations are not internally panmictic, but consist of genetically differentiated subgroups that must be separately specified when a probability calculation is to be made in a particular case." (Lewontin, Population Genetic Problems in the Forensic Use of DNA Profiles, pp. 1-4.)

A conflicting point of view is found in an article authored by Dr. Bruce Budowle and John Stafford of the laboratory division of the FBI.[22] That document states in part:

"Simply stated, the issue is: are various regions of the United States substantially different, such that a general estimate used as a guideline for how common or rare an event is would be misleading?

"SoKal *et al.* (1991) show in a study of 26 genetic systems that there were very few differences among population samples in Europe. Additionally, data on protein genetic markers from various regions within the United States show no substantial differences of genotype frequencies for a racial group from different geographic regions (citation).

"A comparison of VNTR allele (or bin) frequencies (VNTR's are the DNA genetic markers routinely used by the FBI) for Blacks and Caucasians from

---

[22]See footnote 11, *ante.*

Florida, Texas and California demonstrate no forensically significant geographic differences for bin frequency data within each racial group. Additionally, the Technical Working Group on DNA Analysis Methods (TWGDAM) studies support that VNTR data derive from more than a dozen areas in the United States are not substantially different, and therefore, the weight placed on a match (i.e., forensic significance) would not be substantially different, regardless of the subpopulation database employed. Therefore, for the practical applications to which VNTR population data are being applied (i.e., to provide an estimate on how common or rare an event is in the population of potential contributors), any United States sample population group, within a particular racial group, would be appropriate as a database from which to draw statistical inferences.

"The FBI always has recognized that subgroups exist [citation]. However, using the conservative fixed-bin approach, the empirical data show that the effect of population subgroups within the United States on the final statistical estimate is small. It should be noted that the fixed-bin approach was designed intentionally to minimize differences between subgroups, both geographic and ancestral [citation]." (Budowle & Stafford, *Response to Population Genetic Problems in the Forensic Use of DNA Profiles by R. C. Lewontin* (July 1991) 18 Crime Laboratory Dig. pp. 109-110.)

Needless to say, both of the above referenced papers go into significant detail as to the justification and rationale for their differing conclusions. Further, it is evident from the various documents submitted that these authors are distinguished figures in their respective fields. The difficulty is, where does this place us? It places us in the middle of the conflict as to whether or not the basic theory of population genetics involving broad racial and ethnic groups as opposed to the argument of substructure has any general acceptance in the relevant scientific community—a conflict which we cannot resolve on the present record.

The record before us consists of the testimony of one individual of eminent qualifications attesting to the validity of both the RFLP test as it is performed by the FBI and the data base employed to determine the statistical significance of band pattern occurrences. Nothing in the record before the trial court demonstrates the degree of controversy that is reflected in the submitted scientific articles and the emerging case law. On the record before us we cannot begin to decide whether there is any consensus in the scientific community on the basic principles or whether there is any lack of consensus.

Therefore, what course of action should we take? We conclude that in a case of this nature involving evidence of a technique of substantial scientific

complexity it would be inappropriate for us to conclude on the record before us that there is or is not general acceptance in the scientific community. As the Supreme Court stated in *Brown* when confronted with a similar problem regarding electrophoresis:

"In order to end case-by-case controversy over the acceptance of a particular technique, we have occasionally reviewed the scientific literature ourselves in an effort to determine whether a fair consensus on reliability exists. *Shirley* is the most notable example. [Citation.]

"The People and, in a separate brief, the California District Attorneys' Association, warn against such a course here. They urge that the subject matter is too technical and the relevant literature too vast to be assimilated by lay judges lacking the assistance of qualified expert witnesses. Hence, they contend, the result in this case should stand or fall on the trial record, leaving the issue for further development in the trial courts. Under the circumstances, we find wisdom in this view.

"We recognize that *Kelly/Frye* does not demand judicial absorption of all the relevant literature, nor does it require a decision once and for all whether a particular kind of scientific evidence is reliable. The court need only conduct a 'fair overview' of the subject, sufficient to disclose whether 'scientists significant either in number or expertise publicly oppose [a technique] as unreliable.' [Citation.]

"Often, however, the technical complexity of the subject matter will prevent lay judges from determining the existence, degree, or nature of a scientific consensus or dispute without the interpretive assistance of qualified live witnesses subject to a focused examination in the courtroom. It is for this reason that *Kelly/Frye* properly emphasizes the record made in the trial court.

"In *Shirley*, the scientific issue was relatively simple—the long-known tendency of hypnosis to create undetectable and unshakable false memories, despite the best intentions of both hypnotist and subject. The experts had responded to that danger in straightforward terms, permitting this court to conclude that 'major voices in the scientific community [absolutely] oppose the use of hypnosis to restore the memory of potential witnesses. . . .' [Citation.]

"Here, both the technical problem and the state of current scientific opinion are more difficult to comprehend. Electrophoretic typing of human fluid stains is a relatively recent development. [Citations.] The number of

proteins and enzymes theoretically subject to classification is substantial. Each substance apparently has a somewhat different reaction to adverse environments and conditions, and the effects in each case are not yet fully known.

"It does appear that aged or contaminated stains can undergo actual chemical conversions, resulting in spurious or 'false positive' test results. [Citations.] Moreover, the electrophoretic method itself is apparently performed under substantial chemical and electrical variations, and considerable training and experience are necessary to interpret the visual results.

"The People respond with opinions by certain scientists that proper methodology and experienced professional judgment can ensure that any typing results reported will be reliable. [Citations.] It is not clear from our unaided review of these authorities that impartial science has developed a *consensus* on the crucial issue: whether for the typing categories (ABO, PGM, Peptidase-A) and body fluids (semen, blood, saliva, vaginal secretion) at issue here, current methodology, employed by qualified technicians, can discriminate reliably between *testable* and *untestable samples* and between *accurate* and *inaccurate results*.

"We do not suggest that such a consensus is lacking. We simply conclude that the answer must abide an adequate future trial record made with the help of live witnesses qualified in the applicable scientific disciplines. We therefore do not foreclose future attempts to admit stain-typing evidence based on a foundation such as we have described. [Citation.] In this case, such a record not having been made, the evidence should not have been admitted." (*People* v. *Brown, supra,* 40 Cal.3d 512, 533-535, fn. omitted.)

We are unable, based upon the submitted documents, to resolve the question of general acceptance in the scientific community. If they have any significant value to us it is in making it clear that sharp controversy exists. We are well aware that in the scientific community lack of consensus is not uncommon. Therefore, we are, likewise, unable to determine whether there is a lack of general acceptance in the scientific community of the principles underlying the data base utilized by the FBI. This issue must first be resolved in the trial court. Further, we do not think it is generally appropriate that a finding of fact that there is not general acceptance should be made outside the trial record in cases of this complexity.

Parenthetically, we also note that even assuming there is a consensus in the relevant scientific community as to the genetic theory upon which the data base is predicated there remains one additional issue in need of resolution. The validity of the data base is dependent for its accuracy upon the

DNA test that is utilized to analyze the individual allele pattern of each of the persons in the population chosen to make up the data base. Therefore, the validity of the data base does depend in significant degree upon the validity of the DNA test utilized to determine the allele patterns in the target population. Thus, the DNA testing aspect of the data base cannot escape foundational scrutiny.

We conclude, on the present record, that the admission of the RFLP test results in the instant case together with the statistical conclusions drawn thereform, was error.

■ The question remains whether the error in admitting the DNA forensic identification evidence absent compliance with *Kelly/Frye* was prejudicial. The prosecution presented a strong circumstantial case against appellant. Nonetheless, as appellant points out, the DNA identification evidence clearly "sealed appellant's fate." Although the jury might have had a reasonable doubt regarding appellant's guilt absent the DNA evidence, it is difficult to imagine how the jury could have reached other than a guilty verdict when presented with evidence that the likelihood of finding someone else with a DNA profile in the non-Hispanic Caucasian population was 1 in 10,000,000 and 1 in 250,000 in the Hispanic population. Therefore, it cannot be established that the admission of the evidence constituted harmless error.

For the benefit of the court on remand we will address a problem revealed by the statistical method utilized in the instant case.

As evidenced by his testimony, Dr. Adams utilized an Hispanic data base.

"A The significance is that the DNA sample from the semen stain on the vaginal swab matched the DNA from the blood sample of the defendant. On three of the four probes that I analyzed the forth [*sic*] probe just didn't produce adequate results to interpret.

"The next question we have to answer, then, is how often would we expect to find such a profile in the relevant population. In this case I compared these results of the known blood sample of Mr. Pizarro to the Hispanic population. And I found that the likelihood of finding another unrelated individual—

". . . . . . . . . . . . . . . . . . . . .

"Q Did you receive any information as to the ethnic or racial background of the victim and suspect in this particular case?

"A Yes.

"Q And what was the information that you received?

"A I don't recall the information of the victim. I was told that the defendant was Hispanic.

"Q And have you received any particular training with regard to the interpretation of the genetic information that you have with respect to different ethnic groups in your data base?

"A Yes, I was a part of the original research team that actually assisted in putting that together. I had been to several conferences that—where that type of information has been discussed. And I use it on a daily basis.

"Q In applying your experience and expertise along with the information that you gathered from your observations of these autorads, were you able to come up with a statistic as to the chances of another Hispanic male having a similar DNA profile?

"Ms. THOMPSON: Objection. Has the Court made a determination of the expertise of this individual?

"THE COURT: He has not given his opinion. Overruled.

"THE WITNESS: Yes.

"Ms. GEORGE: Q What is your opinion as to the chances of another Hispanic male having the same DNA profile as Mr. Pizarro?

"A The likelihood of finding another unrelated Hispanic individual with a similar profile as Mr. Pizarro is one in approximately 250,000.

"Q And this would also be the same statistic for the probability of a match of a DNA profile between the questioned sample or sample obtained from the vaginal swab?

"A That is correct.

"Q Same statistic?

"A Yes.

"Q And, again, this is only with Hispanic men?

"A Hispanics, not broken down into gender."

In *People* v. *Axell*, the unknown assailant left strands of hair at the crime scene.

"July 28, 1988, Cellmark Diagnostics, a testing laboratory in Germantown, Maryland, received from the district attorney's investigator, whole bloodstains on cotton from the victim and appellant, and roots from 15 hairs recovered from the crime scene. The DNA was extracted from these materials, and Cellmark reported that the banding patterns obtained from the appellant's whole bloodstain matched the DNA banding patterns obtained from the 15 hair roots found at the scene of the murder. Subsequently, Cellmark reported that the frequency of that DNA banding pattern in the Hispanic population is approximately 1 in 6 billion. Appellant is part Hispanic. Simply put, Cellmark's analysis meant that the chance that anyone else but appellant left the unknown hairs at the scene of the crime is 6 billion to 1." (235 Cal.App.3d 836, 844.)

This statement reveals the problem in the instant case. The selected racial or ethnic data base is predicated on the *suspect's* racial or ethnic background. However, the relevancy of the statistical probability depends on the *perpetrator* being the same racial or ethnic background as the suspect. In other words, examining the defendant's DNA banding pattern and concluding that it has an expected frequency of occurrence of, for example, 1 in 500,000 in a specific racial/ethnic data base would reflect the probability that the suspect committed the crime only if the perpetrator was within that same data base. It is clear that all population groups share common allele patterns according to the theory advanced by the FBI—it is the frequency with which these patterns appear within different groups which will vary. Nothing in the record supports the conclusion that the banding patterns are race or ethnic specific so that a review of the banding pattern would conclusively establish that the person who left the sample was of a particular racial or ethnic background. Dr. Adams did not testify and, as we understand the evidence, could not testify that the perpetrator in the instant case was Hispanic based solely upon the allele pattern found in the evidence which was left at the crime scene by the perpetrator. What if the perpetrator was/were Black or non-Hispanic Caucasian, etc., and what is the relevancy of the estimated probabilities for these groups if we do not know the race or ethnic background of the perpetrator? It is a bootstrap argument to assume relevancy of a Black or Hispanic data base simply because the *suspect* falls within that racial or ethnic group.

Evidence Code section 403 provides:

"(a) The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when:

"(1) The relevance of the proffered evidence depends on the existence of the preliminary fact;

"(2) The preliminary fact is the personal knowledge of a witness concerning the subject matter of his testimony;

"(3) The preliminary fact is the authenticity of a writing; or

"(4) The proffered evidence is of a statement or other conduct of a particuar person and the preliminary fact is whether that person made the statement or so conducted himself.

"(b) subject to Section 702, the court may admit conditionally the proffered evidence under this section, subject to evidence of the preliminary fact being supplied later in the course of the trial.

"(c) If the court admits the proffered evidence under this section, the court:

"(1) May, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist.

"(2) Shall instruct the jury to disregard the proffered evidence if the court subsequently determines that a jury could not reasonably find that the preliminary fact exists."

Proffered evidence as utilized in section 403 "means evidence, the admissibility or inadmissibility of which is dependent upon the existence or nonexistence of a preliminary fact." (Evid. Code, § 401.) Here the proffered evidence is the result of statistical analysis which utilizes ratios assigned to particular racial or ethnic data bases. " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

 The disputed fact generally is whether the suspect is also the perpetrator. Thus, the evidence is relevant if it tends to prove the suspect is the

perpetrator. However, the preliminary fact upon which the relevancy of the proffered evidence depends is the racial/ethnic background of the *perpetrator*, not the suspect. If the only way you can conclude the perpetrator fits a racial/ethnic category is to assume the perpetrator was the same race/ethnic background as the suspect then the reasoning is circular, i.e.: proof of the racial/ethnic background of the perpetrator depends on the racial/ethnic background of the suspect from which we infer a statistical probability that the perpetrator is the suspect.[23] Absent proof sufficient under Evidence Code section 403 to support the preliminary fact as to the racial/ethnic background of the perpetrator, we see no relevancy to a data base selected because of the racial/ethnic background of the suspect/defendant. The problems created by employing assumed relevancy of the data base are insidious. A jury hears an astronomical figure that not uncommonly depends for its relevance upon the very issue that they have to decide: is the defendant the perpetrator? The same Evidence Code section 403 problem does not appear, however, if the general population data base, which has been created without regard to race or ethnic background, is utilized.[24]

We must point out that the probative value of DNA matches using the general population data base may well be substantial. For example, the expected frequency of occurrence in the general population may be one in five thousand or even one in five million. This approach establishes a degree of probability that the suspect is the perpetrator, but it does so without *assuming* the suspect and the perpetrator belong to the same ethnic/racial background. Likewise, evidence sufficient under Evidence Code section 403 to support the preliminary fact as to the racial/ethnic background of the perpetrator alleviates this problem.[25] We do not presume that evidence sufficient to support a preliminary factfinding in the instant case does or

---

[23]We are not concluding that the evidence in *Axell* was or was not sufficient to support an Evidence Code section 403 preliminary factfinding. That issue was not before the court in *Axell* and the entire record in *Axell* is not before us for consideration.

[24]We are not called upon nor do we decide whether a defendant would be allowed, under Evidence Code section 210, to demonstrate that, assuming he/she falls within the racial/ethnic background of the perpetrator, the probability factor might be lower.

[25]We would not presume to conclude how a general population data base should be created. However, we note the consensus expressed in the NRC's report on DNA Technology in Forensic Science which suggests a generalized population base utilizing a "ceiling principle." The ceiling principle is predicated on determining the frequency of occurrence of an allele pattern that is "an upper bound for the allele frequency that is independent of the ethnic background of a subject." (DNA Technology in Forensic Science, *supra*, pp. 82-83.) While we cannot comment on the reliability or validity of such a procedure, we note that it would eliminate both questions about substructure as well as Evidence Code section 403 relevancy problems concerning the perpetrators' racial/ethnic background for purposes of utilizing the suspect/defendant's race or ethnicity to select a data base.

does not exist, our comments are designed to assist the trial court in assessing the relevancy of the proffered evidence.[26]

 We conclude, in light of our discussion of error that reversal is necessary in the instant case. However, we are of the opinion that remand is appropriate to allow the trial court the opportunity to conduct a "full blown" *Kelly/Frye* hearing. At the conclusion of the hearing, the trial court must decide whether there is general acceptance in the scientific community of the DNA testing method and the data base utilized in the instant case by the FBI. If, upon remand, the trial court concludes that the procedures and techniques employed by the FBI as well as the data base in question are generally accepted in the relevant scientific community according to *Kelly/Frye* standards, then the concerns of this court as to the admitted evidence will have been addressed just as they would have been addressed had the same issues been resolved by *Axell* or another case on the same issue. (See *People* v. *Smith* (1989) 215 Cal.App.3d 19, 26 [263 Cal.Rptr. 678].) Should the trial court conclude that the evidence in question meets *Kelly/Frye* standards, then the trial court is directed to reinstate the conviction and sentence.[27]

## II.

### *Instructional Error**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

For the reasons stated herein, the judgment is reversed and the matter remanded to the trial court for a *Kelly/Frye* hearing in accordance with this opinion. At the conclusion of the hearing, if the trial court concludes there is sufficient basis to properly admit the testimony presented, the trial court is

---

[26]In this regard we are constrained to note that the use of statistics with respect to probability factors can be misleading. For example, in *People* v. *Axell* the court stated "Cellmark reported that the frequency of that DNA banding pattern in the Hispanic population is approximately 1 in 6 billion. Appellant is part Hispanic. Simply put, Cellmark's analysis meant that the chance that anyone else but appellant left the unknown hairs at the scene of the crime is 6 billion to 1." (*Axell, supra,* 235 Cal.App.3d at p. 844.)

While we need not address this statistical conclusion, we note that conversion of expected frequency of occurrence into odds of occurrence can create misinterpretations. (See William C. Thompson and Edward L. Schumann, *Interpretation of Statistical Evidence in Criminal Trials: The Prosecutor's Fallacy and the Defense Attorney's Fallacy* (1987) 11 Law and Human Behavior 167.)

[27]In light of our determination that remand is necessary to address *Kelly/Frye* requirements, we conclude it is unnecessary to address appellant's assertion trial counsel was *ineffective* for failing to present expert testimony at the foundational hearing.

*See footnote, *ante,* page 57.

directed to reinstate the judgment which shall stand affirmed. If the trial court determines the evidence is insufficient to properly admit the testimony presented, the judgment shall stand reversed.

Best, P. J., and Schultz, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied January 21, 1993.

---

*Judge of the Kings Superior Court sitting under assignment by the Chairperson of the Judicial Council.